IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

Criminal Action No. ELH-14-0109

BRANDON FERRELL,

*Petitioner*.

## MEMORANDUM

The self-represented Petitioner, Brandon Ferrell, filed a "Motion For Reconsideration of Judgment" on January 21, 2021.  ECF 96 (the "Motion").  He also submitted exhibits.  Despite the title of the submission, it appears to constitute a motion for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i).  Indeed, that is the provision of law that Ferrell expressly cites in his Motion. *Id.* at 1.  Therefore, I shall construe ECF 96 as a motion for compassionate release.[1]  The government opposes the Motion.  ECF 101.  Ferrell has not replied.

No hearing is needed to resolve the Motion.  For the reasons that follow, I shall deny the Motion.

## I.       Factual and Procedural Background

In March 2014, Ferrell and codefendant Stephanie Smith were charged with multiple crimes.  ECF 1.  In particular, Ferrell was charged as follows:  conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); four counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Counts Two, Four, Six, and Eight); four counts of possessing

---

[1] The Court issued a Memorandum (ECF 94) and Order (ECF 95) on October 15, 2020, denying Ferrell's § 2255 petition.  To the extent that ECF 96 constitutes a motion under Fed. R. Civ. P. 60(b), the government correctly points out in ECF 102 that there is no basis for such relief.

and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts Three, Five, Seven, and Nine); and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g) (Count Ten).

The case was initially assigned to Judge William D. Quarles, Jr.[2]  On October 1, 2014, Petitioner entered a plea of guilty before Judge Quarles to Counts Two and Three of the Indictment. ECF 22 (Rearraignment); ECF 25 (Plea Agreement).  The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C).  ECF 25, ¶ 6(c).  In the Plea Agreement, the parties stipulated that the § 924(c) offense in Count Three was based on the Hobbs Act robbery offense in Count Two. *Id.* ¶ 2.  Under the Plea Agreement, the parties stipulated to a sentence of fifteen years for Count Two and seven years, consecutive, for Count Three, for a total sentence of 22 years (264 months).  *Id*. ¶ 6(c).

Specifically, the parties agreed with respect to the offense elements of Counts Two and Three as follows, ECF 25, ¶ 2:

Count Two:

    a.  On or about September 27, 2013, the Defendant, acting with Stephanie Amber Smith, interfered with interstate commerce and the movement of articles and commodities in such commerce through the commission of the robbery of a 7-Eleven convenience store located at 3500 Boston Street, Baltimore, Maryland;

    b.  The robbery involved the taking of $160.00, more or less, from another by the wrongful use of actual or threatened force or violence;

    c.  The 7-Eleven convenience store located at 3500 Boston Street, Baltimore, Maryland was engaged in the retail sales of consumer products obtained from vendors within and outside the state of Maryland and, thus, affected interstate commerce.

Count Three:

    a.  The Defendant, acting with Stephanie Amber Smith, did possess and

---

[2] The case was reassigned to me in May 2016, due to the retirement of Judge Quarles.  *See* Docket.

        brandish a firearm during and in relation to the robbery of the 7-Eleven
convenience store;

    b.  The Defendant knowingly possessed and brandished said firearm;

    c.  The robbery of the 7-Eleven convenience store is a crime which may be
prosecuted in a court of the United States.

In addition, in the Plea Agreement, Ferrell agreed that he committed three other gunpoint

robberies of convenience stores on September 29, 2013. *Id.* ¶ 6(a); *see also* ECF 101 at 15. These

crimes occurred just two days after the 7-Eleven robbery at issue here.

Sentencing was held on December 17, 2014. ECF 45. At the time, Ferrell was 23 years

old. *See* Presentence Report (the "PSR," ECF 40) at 3. The PSR reflected a combined adjusted

offense level of 29. *Id.* ¶ 39. After deductions for acceptance of responsibility, Ferrell had a total

offense level of 26. *Id.* ¶ 43. The PSR also considered the three additional robberies of September

29, 2013, to which Ferrell had stipulated in the Plea Agreement. *Id.* ¶¶ 11, 18-34.

In addition, the PSR reflected that Ferrell had eleven prior adult criminal convictions. *Id.*

¶¶ 51-60. In addition, he had five juvenile adjudications, of which one scored points. *Id.* ¶¶ 45-

49. This yielded a subtotal of 17 criminal history points. *Id.* ¶ 61. And, two points were added

because Ferrell committed the instant offense while under mandatory supervision for robbery,

resulting in a total of 19 points. *Id.* ¶¶ 62-63. This yielded a criminal history category of VI. *Id.*

¶ 63. Some of the prior offenses are discussed below.

With a final offense level of 26 and a criminal history category of VI, the advisory

sentencing guidelines ("Guidelines" or "U.S.S.G.") called for a period of incarceration ranging

between 120 months and 150 months, as well as the minimum term of 84 months of imprisonment,

consecutive, required by statute for Count Three. *Id.* ¶ 87. So, the Guidelines totaled 204 months

to 234 months. However, based on the stipulated conduct concerning three other armed robberies,

Ferrell agreed in the Plea Agreement to an upward departure and variance from the Guidelines for Count Two.  ECF 25, ¶ 6(a); *see also* ECF 40, ¶¶ 5, 11, 12-34, 88.

Petitioner is 5'8" tall and, at sentencing, he weighed 160 pounds.  ECF 40, ¶ 78.  Petitioner was married in 2013.  *Id*. ¶ 75.  He and his wife have one child together, and his wife has two other children who regard Ferrell as their father.  *Id*.

According to the PSR, Petitioner reported that he was in good health.  *Id*. ¶ 78.  But, his wife advised that he used an inhaler when needed for asthma.  *Id*.  He was shot in the buttocks in 2010.  *Id*.  Ferrell stated that prior to his arrest, he drank alcohol three times per week; began using marijuana daily at the age of 12 or 13; began using heroin almost daily at the age of 18; and abused ecstasy and Percocet.  *Id*. ¶ 80.

The PSR noted that Ferrell's father has never been a part of his life, and his mother died from medical problems when Ferrell was eleven years of age.  *Id*. ¶ 74.  While Ferrell's mother was alive, she was verbally and emotionally abusive towards Ferrell.  *Id*. ¶ 79.  After his mother's death, Petitioner lived with his aunt, who became his legal guardian.  *Id.* ¶ 74.  However, he stated that they did not maintain a close relationship.  *Id*.

Notably, the defendant was diagnosed with behavioral issues when he was young.  *Id.* ¶ 79.  And, while in pretrial custody for this case, he was prescribed medications for depression and anxiety.  *Id.*

The PSR reviewed Ferrell's prior record.  In 2009 Ferrell was convicted in the District Court for Baltimore City of theft of less than $100.  He was sentenced to six months' probation before judgment.  *Id*. ¶ 51.

Ferrell was convicted in 2011 in the Circuit Court for Baltimore County of robbery, for which he was sentenced to eight years of incarceration, five of which were suspended.  *Id*. ¶ 53.

Ferrell was 19 years old at the time of the offense.  *Id.*  The PSR recounts that, according to the Statement of Probable Cause, Ferrell and two others "were driving in a vehicle that hit an elderly woman."  *Id.*  When the woman exited her vehicle, one of the assailants grabbed her purse.  *Id.*  The three individuals then got back into their vehicle and fled, dragging the victim by the vehicle.  *Id.*  Ferrell was released on mandatory supervision in 2013.  *Id.*  As of sentencing in this case, a violation of probation was pending.  *Id.*

Also in 2011, Ferrell was convicted in the Circuit Court for Baltimore County of a "Rogue & Vagabond" offense.  ECF 40, ¶ 54.  He was sentenced to one year and one day of incarceration.  *Id.* ¶ 54.

In October 2014, Ferrell pled guilty in the Circuit Court for Baltimore City to multiple charges of armed robbery, conspiracy to commit armed robbery, and the use of a firearm in a crime of violence, all of which occurred in October 2013.  *Id.* ¶¶ 59, 60. [3]  Disposition was held sub curia until December 18, 2014, *i.e.*, the day after sentencing in this case.  *Id.*  The PSR recounts that, according to the Statement of Charges, Ferrell and a codefendant committed two robberies at gunpoint, in which the victims sustained injuries to their heads after being hit with the gun.  *Id.*  A related case of felon in possession of a firearm was set for trial for December 18, 2014.  *Id.* ¶ 60.

In addition, between 2011 and 2014, Ferrell was convicted five times of driving without a license.  *Id.* ¶¶ 52, 55-58.  The first time, in the Circuit Court for Baltimore City, Petitioner was also convicted of attempting to elude police by failing to stop, and sentenced to 18 months of probation before judgment.  *Id.* ¶ 52.  In November 2011, a violation of probation hearing was held, and Ferrell was sentenced to one year and two months of imprisonment, with credit for five

---

[3] Paragraph 59 of the PSR indicates an offense date of "10/06/2013."  But, the descriptive text indicates that the offense occurred on October 5, 2013.  The discrepancy is not material.

months and 17 days.  *Id.*  The remaining driving convictions were in the District Court for Baltimore City, and resulted in sentences of between 30 and 60 days of incarceration.  In one case, the period of incarceration was suspended.  *Id.* ¶¶ 55-58.

Of Ferrell's juvenile adjudications, the only one to score points involved the offense of motor vehicle theft in 2008 in Anne Arundel County.  ECF 40, ¶ 49.  Ferrell was seventeen years old at the time of the offense.  *Id.*  Significantly, he was committed to the Department of Juvenile Services and placed at Turning Point Youth Center from August 14, 2008 through May 22, 2009. *Id.*  About a month later, he was committed to Cheltenham Youth Facility for 46 days.  Then, on May 26, 2009, he was placed at another youth facility, where he remained for 25 days, until his arrest as an adult on June 20, 2009.  *Id.*  Four other juvenile adjudications, between 2005 and 2008, scored no points.  *Id.* ¶¶ 45-48.

In 2009, while Petitioner was at Turning Point Youth Center, he graduated from high school through St. Johns High School in Michigan.  And, he later attended Catonsville Community College for two semesters.  *Id.* ¶ 81.

Judge Quarles sentenced Petitioner to 156 months' imprisonment as to Count Two and 84 months' imprisonment, consecutive, as to Count Three, for a total sentence of 240 months (20 years).  ECF 49 (Judgment).  Judge Quarles noted Ferrell's stipulation to three other robberies, and concluded that the Rule 11(c)(1)(C) sentence was appropriate given "the defendant's serious criminal record of robbery and firearms offenses."  ECF 50 (Statement of Reasons) at 3.[4] Petitioner received credit for time in custody since October 2013.  *Id.*  Counts One, Four, Five,

---

[4] Judge Quarles indicated that he was accepting the Rule 11(c)(1)(C) sentence. *See* ECF 75 (Sentencing Tr.) at 3. But, the sentence he imposed was two years below the C plea sentence. At the sentencing hearing, Judge Quarles commented that Ferrell was getting "the benefit of two years," but did he not elaborate. *Id.* at 4. However, no party has addressed the matter, and the discrepancy was obviously to Ferrell's benefit.

Six, Seven, Eight, Nine, and Ten were dismissed on the government's motion. *Id.* Petitioner did not appeal his conviction or sentence.

On June 7, 2016, Petitioner filed a pro se motion to vacate judgment under 28 U.S.C. § 2255, based on the Supreme Court's ruling in *Johnson v. United States*, 576 U.S. 591 (2015). ECF 68. There, the Supreme Court ruled that the residual clause of the Armed Career Criminal Act's definition for violent felony, at 18 U.S.C. § 924(e)(2)(B)(ii), was unconstitutionally vague. Through the Office of the Federal Public Defender ("FPD"), Ferrell filed a supplemental motion. ECF 69.

Then, on April 4, 2019, Petitioner, through the FPD, filed another supplement to his motion to vacate, citing *Sessions v. Dimaya*, ___ U.S. ___, 138 S. Ct. 1204 (2018). ECF 76. In *Dimaya*, the Supreme Court applied *Johnson* to the residual clause of the crime of violence definition in 18 U.S.C. § 16(b). *Dimaya*, 138 S. Ct. at 1210. And, Ferrell suggested that the Court should hold his case in abeyance pending the outcome of the Supreme Court's decision in *United States v. Davis*, ___ U.S. ___, 139 S. Ct. 2319 (2019). ECF 76.

On June 24, 2019, the Supreme Court issued its decision in *Davis*, ruling that the "residual clause" definition of a crime of violence in 18 U.S.C. § 924(c)(3)(B) was unconstitutionally vague. *Davis*, 139 S. Ct. at 2334. However, the Fourth Circuit subsequently ruled that Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), qualifies as a crime of violence under the force clause of 18 U.S.C. § 924(c). *See United States v. Mathis*, 932 F.3d 242, 266 (4th Cir. 2019), *cert. denied sub nom. Uhuru v. United States*, 140 S. Ct. 639 (2019); *see also Stokes v. United States*, ___ U.S. ___, 140 S. Ct. 640 (2019).

Thereafter, the FPD moved to withdraw as counsel with respect to the motion to vacate. ECF 84. On February 27, 2020, I granted that motion. ECF 85. Then, on June 17, 2020, the Court

docketed Petitioner's motion to amend and expand his pending § 2255 Petition. *See* ECF 88; ECF 89. By Memorandum and Order of October 15, 2020, I denied the § 2255 Petition.

Petitioner is serving his sentence at USP Victorville, California. ECF 916 at 12. He has a projected release date of September 1, 2031. ECF 101 at 2. Including credit for time in State custody, Ferrell has served about 102 months of his 240-month sentence, or 43%.

Petitioner claims that he has fully exhausted his administrative remedies by seeking relief from the Warden, Felipe Martinez, Jr., who has not responded. *Id.* at 3, 5, 8, 9. And, he has included what he describes as his request to the Warden. *See* ECF 96-2. The government indicates that the institution has no record of an application for relief filed by Ferrell. ECF 101 at 2.

Ferrell asserts that his disciplinary record contains no "violent shots." ECF 96-1 at 2. Meanwhile, the government contends that Petitioner "has a less than stellar disciplinary history within the BOP, compiling violations for fighting, insubordination, and possession of a weapon and other violations." ECF 101 at 9. This portion of the government's brief appears to cite to an exhibit, but no exhibits have been included. *Id.* The only documentation provided to the Court is the "Disciplinary History (Last 6 months)" section of Ferrell's Individualized Needs Plan. *See* ECF 96-4 at 1. This information reflects that Ferrell had disciplinary hearings in May and August 2020, for refusing to obey an order and for mail abuse. *Id.*

As grounds for relief, Ferrell states that he has "borderline hypertension" and is "an ex smoker with lung damage." *Id.* at 9. Further, he cites his record of taking rehabilitative courses, ECF 96 at 9-11, claiming they "show that he poses no threat or danger . . . to the community." *Id.* at 9. He asserts, *id.* at 11: "This court should look at the record of rehabilitation and determine that extraordinary and compelling reasons exist in support of the motion for sentence reduction." *Id.* at 11. He also claims that his sentence "is grossly disproportionate to the sentence allowable

now." *Id.*

The government disputes Petitioner's claim that he is not a danger to the community. ECF 101 at 2. Moreover, the government claims that Petitioner has refused to be vaccinated for COVID-19, although it has not provided any documentation in support of the assertion. In any event, given Petitioner's age of 30, the government asserts that defendant has no medical issues warranting his release. *Id.*

## II.      Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, ___ F.4th ___, 2022 WL 905436, at *3 (4th Cir. Mar. 29, 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence, if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 2022 WL 905436, at *3. This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 Fed. App'x

862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release. *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 2022 WL 905436, at *3; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission. Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. Moreover, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.

The Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 Fed. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)). In § 1B1.13 of the United States Sentencing Guidelines ("U.S.S.G."), titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See*

*McCoy,* 981 F.3d at 276-77.[5]

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d

---

[5] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to the court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 2022 WL 905436, at *3-4. Consequently, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 2022 WL 905436, at *6. But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, ___ F. App'x ___, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, ___ F. App'x ___, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t). However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187. Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to

compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 2022 WL 905436, at *3.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 2022 WL 905436, at *4; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted);

*see Jenkins*, 22 F.4th at 169.  Nevertheless, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III.    COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6]  Defendant filed his motion for compassionate release in February 2021.  ECF 322.  At the time, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

---

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In February 2022, it updated its guidance to reflect the most available data.

*See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 25, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

With respect to compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 2022 WL 905436, at *4. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at *5.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*,

CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through*

*the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[7]

---

[7] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing

---

the article, the actual count is most likely much higher "because of the dearth of testing."  *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[8] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 66% of the total U.S. population is fully vaccinated, including 28% of people from ages 5 to 11, 59% of people from ages 12 to 17, 72% of people from ages 18 to 64, and 90% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Apr. 14, 2022).

Moreover, approximately 99 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Apr. 14, 2022).  And, federal regulators have recently approved a second booster dose for individuals age 50 and older.  *See* Cheyenne Haslett

---

[8] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 14, 2022, the BOP had 136,315 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 311,815 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 14, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");   *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States.  It sparked further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Recently, the number of COVID-19 cases began to decline considerably.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-

variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.  The country generally began to enjoy a return to normalcy.  However, the respite appears short-lived; we have again begun to experience an uptick in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.

As of April 14, 2022, COVID-19 has infected more than 80 million Americans and caused approximately 987,000 deaths in this country.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Apr. 14, 2022).  And, as of the same date, the BOP reported that 59 federal inmates, out of a total population of 136,315, and 153 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 52,979 inmates and 12,544 staff have recovered from the virus.  In addition, 293 inmates and seven staff members have died from the virus.  The BOP has completed 128,782 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to USP Victorville, where the defendant is imprisoned, the BOP reported that as of April 14, 2022, out of a total of 993 inmates, zero inmates and 13 staff members have tested positive, one inmate has died of COVID-19, and 525 inmates and 111 staff have recovered at the facility. In addition, 556 staff members and 3,879 inmates at the USP Victorville complex have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/vip/ (last visited Apr. 14, 2022).

## IV.    Discussion

### A. Exhaustion

The government disputes that Ferrell has satisfied his administrative exhaustion requirement.  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *See, e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

In *Muhammad*, 16 F.4th 126, the Fourth Circuit made clear that, under a plain reading of the statute, a defendant need only wait until the 30 days have passed from receipt of his compassionate release request by the warden to directly petition the court.  *Id*. at 129.  "The text of § 3582(c)(1)(A) plainly provides that a defendant may file a motion on his own behalf 30 days after the warden receives his request, regardless of whether the defendant exhausted his administrative remedies."  *Id*.  Thus, the term administrative "exhaustion," although commonly used, may to some extent be a misnomer.  In any case, the statute is clear that a defendant must have, at the very least, directed a compassionate release request to the warden before filing such a request in court.  *See McCoy*, 981 F.3d at 276 (noting that "defendants now may file motions for sentence modifications on their own behalf, *so long as they first apply to the BOP*.") (emphasis added).

The Fourth Circuit also clarified in *Muhammad*, 16 F.4th at 130, that this administrative requirement "is a non-jurisdictional claim-processing rule," rather than a jurisdictional provision. This means that it can be "waived if it is not timely raised." *Id*. at 129. Here, however, the government has raised it.

As noted, Petitioner claims that he has fully exhausted his administrative remedies by seeking relief from the Warden, Felipe Martinez, Jr., who has not responded. *Id.* at 3, 5, 8, 9. And, he has included with the Motion what he describes as his request to the Warden. *See* ECF 96-2. This letter, requesting compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) and BOP policy, is addressed to Warden Martinez. *Id*. It is dated December 5, 2020, and appears to have been signed by Ferrell on December 7, 2020. *Id*.

The government indicates that the institution has no record of an application for relief filed by Ferrell, saying it has "double-checked for a filing but could not locate one." ECF 101 at 2. However, it has provided no documentation as to this issue, nor has it addressed the letter that Ferrell has provided with the Motion.

Given Ferrell's seemingly authentic letter requesting compassionate release attached to the Motion, and the government's lack of documentation as to its assertion that Petitioner has not applied for compassionate release, I will assume that Ferrell has satisfied his administrative exhaustion requirement. However, as discussed below, this is a moot point, because the Motion fails on the merits.

### 2. Merits

To support his claim for extraordinary and compelling circumstances warranting compassionate release, Ferrell cites his medical conditions, namely that he has "borderline hypertension" and is an "ex smoker with lung damage," which place him at greater risk for

26

COVID-19.  ECF 96 at 9.  In his letter to the Warden, he described himself as having "possible lung damage due to smoking cigarettes from a young age."  ECF 96-2 at 2.  The government responds that Ferrell is "young and healthy, with no medical vulnerabilities," and also notes that he has refused the COVID-19 vaccination.  ECF 101 at 13.

Neither side has provided any medical documentation to support these various assertions, making it difficult to evaluate them.  As to Ferrell's claimed medical conditions, the CDC has noted that "high blood pressure (hypertension)" potentially "can make you more likely to get very sick from COVID-19."  *People with Certain Medical Conditions, supra*.  And, courts have found that, in light of the COVID-19 pandemic, hypertension, combined with other conditions, qualifies as a compelling reason for compassionate release. *See, e.g., United States v. Thomas*, 471 F. Supp. 3d 745, 749 (W.D. Va. 2020) ("[C]ourts . . . across the country have released individuals suffering from hypertension, *but only when these individuals also suffered from other underlying medical conditions*.") (emphasis added);  *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason).

Nevertheless, there are some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole condition.  *See, e.g.*, *United States v.*

*Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).  Regardless, "borderline hypertension" is not mentioned by the CDC as increasing the risk posed by COVID-19.  *See People with Certain Medical Conditions, supra*.[9]

I am mindful that the CDC's criteria are not binding in the analysis of whether a health condition qualifies as an extraordinary or compelling basis for compassionate release.  *See Hargrove*, 2022 WL 905436, at *4-5.  But, a number of courts have been skeptical about borderline hypertension as a basis for a finding of extraordinary and compelling circumstances.  *See, e.g.*, *United States v. Suescun*, No. 21-10201, 2021 WL 5575537, at *1-2 (11th Cir. Nov. 30, 2021) (district court did not abuse discretion in denying compassionate release when defendant only submitted evidence of borderline symptoms of hypertension); *United States v. Mason*, No. 96-CR-126, 2021 WL 37576, at *2-3 (S.D.N.Y. Jan. 5, 2021) (no extraordinary and compelling circumstances for defendant with Body Mass Index of 30 and borderline hypertension and diabetes); *United States v. Aslam*, Crim. No. 17-50-RGA, 2020 WL 4501917, at *3 n.1 (granting compassionate release, but noting that defendant's borderline hypertension was not a "significant factor" in deciding the motion); *United States v. Malone*, No. 1:15-cr-373, 2020 WL 3317240, at *3-4 (N.D. Ohio June 18, 2020) (denying compassionate release for defendant with "self-diagnosis" of borderline hypertension and family history of hypertension).

---

[9] "The terms 'prehypertension' and 'borderline hypertension' are interchangeable and refer to the same range of blood pressure readings." *Watkins v. Shinseki*, No. 12-1954, 2013 WL 4027453, at 2 n*7 (Vet. App. Aug. 7, 2013) (internal citations omitted). The Mayo Clinic advises: "Elevated blood pressure means that your blood pressure is slightly above what is considered normal. Some doctors refer to slightly elevated blood pressure as prehypertension. Elevated blood pressure will likely turn into high blood pressure (hypertension) unless you make lifestyle changes, such as getting more exercise and eating healthier foods." *Elevated blood pressure*, MAYO CLINIC (Jan. 14, 2021), https://www.mayoclinic.org/diseases-conditions/prehypertension/symptoms-causes/syc-20376703.

Although the extent of any "lung damage" from Ferrell's status as a former smoker is unclear, the CDC explicitly notes that "[b]eing a current or former cigarette smoker can make you more likely to get very sick from COVID-19." *People with Certain Medical Conditions, supra*. Court rulings as to whether being an ex-smoker constitutes extraordinary and compelling circumstances are mixed. *See, e.g.*, *United States v. Avalos*, 856 Fed. App'x 199, 205 (10th Cir. 2021) (reversing district court's denial of compassionate release "solely on the basis" of its erroneous finding that being a former smoker was not identified by the CDC as increasing the risk of complications from COVID-19, but expressing no opinion on the ultimate merits); *United States v. Murry*, 538 F. Supp. 3d 615, 618 (E.D. Va. 2021) (declining to find extraordinary and compelling circumstances for defendant who had not regularly smoked cigarettes in ten years); *United States v. Brady*, CR No. 19-054-JJM, 2020 WL 7323366, at *3 (D.R.I. Dec. 11, 2020) (noting that "smoking history alone is not sufficient for this Court to find extraordinary and compelling grounds for release"); *Musa v. United States*, 502 F. Supp. 3d 803, 814 (S.D.N.Y. 2020) ("[C]ourts in this circuit have concluded that the mere assertion that a defendant is a former smoker is insufficient to merit release."); *United States v. Greene*, No. 1:17-CR-00012-NT, 2020 WL 4475892, at *4 (D. Me. Aug. 4, 2020) (40 year old former cigarette smoker with no other medical conditions that elevate risk of contracting COVID-19 did not establish extraordinary and compelling grounds for release); *United States v. Tranter*, 471 F. Supp. 3d 861, 865 (N.D. Ind. 2020) (defendant's status as a former smoker "could put him at an increased risk for severe illness," but he "has identified no adverse health effects resulting from his smoking past").

Ferrell's status as a former smoker, with his asserted "lung damage" (ECF 96 at 9), might be enough to constitute extraordinary and compelling circumstances. However, Ferrell's claim for such a finding is severely weakened by his apparent refusal to receive the COVID-19 vaccine. The

government maintains that Ferrell has refused vaccination.  *See* ECF 101 at 2, 12, 13.  But, it has not provided any documentation of its contention.  On the other hand, Ferrell does not contest the assertion by way of a reply.  Nor has he offered any explanation or justification for his decision to decline the vaccine.

The CDC has emphasized that, even if there are some breakthrough cases, "COVID-19 vaccines are safe and effective," and "COVID-19 vaccination helps protect adults and children ages 5 years and older from getting sick or severely ill with COVID-19 and helps protect those around them." *COVID-19 Vaccines Are Effective*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/index.html (last updated Dec. 23, 2021).  Moreover, I have joined a growing number of district court judges across the country, including in the District of Maryland, in reasoning that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.

As Judge Gallagher of this Court has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release. . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021);

*United States v. Cain*, 1:16-CR-00103-JAW, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, 5:18-CR-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, CR 19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

Given the borderline status of defendant's asserted health conditions, coupled with Ferrell's decision to decline the COVID-19 vaccine, I conclude that he has not demonstrated extraordinary and compelling circumstances warranting compassionate release on the basis of his risk of complications from COVID-19.

Petitioner also asserts, without elaboration, that his sentence "is grossly disproportionate to the sentence allowable now."  ECF 96 at 11.  The Court is not aware of any changes to sentencing law that might support this claim.  The mandatory minimum sentence for Ferrell's § 924(c) offense remains seven years consecutive, just as it was when he was sentenced, and that is the sentence Ferrell received.  *See* 18 U.S.C. § 924(c)(1)(A)(ii), (1)(D)(2).  Likewise, the maximum sentence for Hobbs Act robbery remains 240 months of imprisonment, well above the term of 156 months' of imprisonment that Ferrell received.  *See* 18 U.S.C. § 1851(a).  And, as noted, the Fourth Circuit has determined that Hobbs Act robbery qualifies as a crime of violence under § 924(c). *See Mathis*, 932 F.3d at 266.

As mentioned, Petitioner also cites to his rehabilitative record.  *See* ECF 96 at 9-11; ECF 96-3; ECF 96-4.  This includes completion of the Non-Residential Drug and Alcohol Program; participation in various educational and vocational courses; and employment in the prison chapel.

To be sure, he Court must make an individualized assessment.  *McCoy*, 98 F.3d at 286. This may include factors such as rehabilitation and other post-sentencing conduct, youth, the ill health of a family member, and more.  *Harris*, 2022 WL 636627, at *1; *Davis*, 2022 WL 127900, at *1-2; *McCoy*, 981 F.3d at 286-87.   Although Petitioner's rehabilitative record is laudable, "rehabilitation alone cannot serve as a basis for compassionate release."  *Davis*, 2022 WL 127900, at *1.  Furthermore, rehabilitation must be balanced against other factors, such as the gravity of Petitioner's offense.  Keeping in mind that compassionate release is properly reserved for "the most grievous cases," *McCoy*, 981 F.3d at 287, Ferrell's arguments do not support a finding of extraordinary and compelling circumstances.

Even assuming, *arguendo*, that Ferrell has established extraordinary and compelling circumstances on the basis of his medical history or other grounds, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) in deciding whether to exercise its discretion in favor of release. *See High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6308, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186. The § 3553(a) sentencing factors weigh against release.

As Ferrell notes in the Motion (ECF 96-1 at 1), the offense to which he pled guilty involved only $160.  But, that was a matter of happenstance.  The crime was extremely serious: an armed robbery during which Petitioner brandished a firearm.  *See* ECF 25, ¶ 2.  And, the offense could have resulted in grievous physical injury, to say nothing about the emotional trauma that is often

experienced by a victim who faces a deadly weapon under such circumstances.  And, Ferrell stipulated to the commission of three other armed robberies just two days after the one at issue. *See id*. ¶ 6(a); ECF 40, ¶¶ 12-34.  Furthermore, Ferrell has an extensive criminal history, including other convictions for armed robbery.  *See* ECF 103, ¶¶ 53, 59, 60.  He has violated probation multiple times, and indeed committed the instant offense while on probation.  *See id*. ¶¶ 52, 53, 61-63.  Moreover, he has served less than half of his sentence in this case.

### V.    Conclusion

For the reasons set forth above, I conclude that Ferrell has not demonstrated that compassionate release is warranted in his case.  Accordingly, I shall deny the Motion.

An Order follows, consistent with this Memorandum Opinion.

Date: April 15, 2022                                    _____/s/_____
                                                                    Ellen L. Hollander
                                                                    United States District Judge